# COURT OF APPEALS OF VIRGINIA

---

**Record No. 0203-25-1**

---

ALEXANDER LEE HARBIN
v.
COMMONWEALTH OF VIRGINIA

---

Present: Judges Ortiz, Chaney and Frucci

Argued at Virginia Beach, Virginia

Opinion Issued July 28, 2026[*]

---

**FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE**
Rufus A. Banks, Jr., Judge

Elena Kagan, Assistant Public Defender (Virginia Indigent Defense Commission, on briefs), for appellant.

Israel-David J.J. Healy, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

---

**MEMORANDUM OPINION BY**
**JUDGE VERNIDA R. CHANEY**

Following a bench trial, the court convicted Alexander Harbin on three counts of assault and battery of a family member, three counts of abduction by force, two counts of malicious wounding, two counts of reckless care of a child, and one count of strangulation. Harbin challenges the sufficiency of the evidence supporting only his abduction, child neglect, and malicious wounding convictions. For the following reasons, this Court affirms those convictions.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[2]

Harbin married Sarah in August 2021, and their daughter, D.H., was born in April 2022. Sarah testified that on October 11, 2022, Harbin entered their bedroom while she was sleeping, turned on all the lights, and screamed that she had ruined his life. R. 284, 319. Harbin ripped the covers off the bed, grabbed her by the hair on both sides of her head, "ripped [her] out of the bed," and pulled her to the floor. R. 280-81. Harbin spat on Sarah, called her a bitch and a whore, punched and slapped her, and kicked her in the face and on her chest. R. 281. When Sarah yelled that the baby was going to wake up, Harbin stopped "for a brief moment," allowing Sarah to retrieve D.H. from the crib. R. 281. As she stood holding D.H., Sarah decided to "make a run for it." R. 281. But when she tried to exit the bedroom, Harbin grabbed her again by the root of her hair and pulled her back and downward, causing her to fall to the floor. R. 282. D.H. fell out of her arms and landed on the bed. R. 282.

Harbin dragged Sarah from the bedroom by her hair and into the hallway, where he picked up her head and "smashed it a few times." R. 283. Sarah testified that Harbin stood over her with one leg on each side of her body and "just kept slamming [her head] into the threshold" of the bathroom door. R. 283. She was facing the floor, and her eyes were shut, while Harbin called her a "bitch" and told her that she was "going to fucking die" because she ruined his life. R. 284. Sarah yelled that he was going to kill her and felt like she was losing consciousness, but she could hear D.H. crying in the bedroom. R. 283. Harbin eventually stopped, and she ran to comfort the baby. R. 284-85. After the attack, Sarah noticed that she was "missing a lot of hair

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In doing so, we discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Gerald*, 295 Va. at 473.

out of [her] head" and that she had a few "knots" on her forehead and scalp. R. 285. She also had bruises all over her body. R. 285.

At work the next day, Sarah asked a colleague to take photographs of her injuries because Harbin often went through her phone.[3] She also communicated with Harbin by text, in which the following exchange occurred:

> Sarah: Alex, you beat the shit out of me. My head was bleeding in multiple areas. You were slamming my head against the floor, and I'm bald in a few spots. You kept telling me all the ways you were going to kill me. We will not be here. We aren't safe here. I'm not willing to risk it. You obviously have stuff here and will be here in the morning for your work van and stuff. And, again, I'm not willing to risk it. If you're moving to NC, that's totally fine. Now, we know we can both move out of state.
>
> Harbin: Okay. We'll let our lawyers do the figuring. Thanks.
>
> Sarah: And your pride and inability to control your temper has ruined so much for you. Okay. No problem if you want to go the lawyer route instead of mediation like you asked for, that's completely fine with me.

R. 290-91; CW's Ex. 2. Sarah did not call the police because she was scared and in shock. She feared Harbin and worried about what would happen if she called. She did not seek medical treatment because she was ashamed and "didn't want to admit that [the abuse] was going on."

On April 6, 2023, Sarah was again sleeping in her bed when Harbin entered the bedroom and laid next to her. R. 292-93. He fell asleep for a short while but then awoke very angry after having a dream that Sarah was cheating on him. R. 293. Harbin began to punch her with his fists, as she put her arms up to shield herself. R. 293. He left the room for a minute but then ran back into the room, jumped on the bed, and punched Sarah so hard in the ribs that he knocked the air out of her. R. 293. Harbin screamed "vulgar, nasty things" at Sarah and woke up the baby. R. 293. Sarah walked into D.H.'s room and picked her up to rock her back to sleep. R.

---

[3] The photographs were admitted at trial.

293. But then Harbin walked into the room with that "look he still had on his face" and Sarah "knew it wasn't over." R. 293. Sarah told Harbin to stop, but he pushed the crib out of the way and grabbed her by the neck on the same side of the head that she was holding D.H. Harbin noticed that the baby camera was recording his actions, so he grabbed the camera and ripped it off D.H.'s changing table.[4] R. 294. He headbutted Sarah, and she fell to the ground with the baby. R. 296. He kicked her with the front of his boot and then stomped on her "over and over again." R. 296. Harbin called her vulgar names and repeatedly hit and slapped Sarah, who covered D.H.'s head with her arms to shield her from Harbin's slaps. R. 296. When Sarah yelled, "the baby, the baby," Harbin mocked, "Oh, the baby, the fucking baby." R. 296.

Harbin demanded to see Sarah's phone, but she lied, stating it was in their bedroom. R. 297. When he went to look for it, Sarah quickly saved D.H.'s baby cam video and sent it to her friend Jennifer McDonald. R. 297. She then deleted the text message thread so Harbin would not find it. R. 297. Sarah locked herself and D.H. in the bathroom and waited for Harbin to leave. R. 299. She was again missing hair and sustained another knot on her forehead, along with bruising "all up and down [her] legs" and on her neck, and she had a "busted lip, a busted eye." R. 299; CW's Ex. 4. She did not seek medical treatment because she was "just happy it was over." R. 301-02.

By July 27, 2023, Harbin and Sarah were "getting along for the most part." Harbin asked Sarah to meet him at their home (she had already moved out), and she agreed. When she arrived, she was surprised to find all the doors locked; she had to enter the house through the garage. From the kitchen, Sarah saw Harbin standing in the living room with a stern look on his face and "knew what was coming." Harbin motioned for her to sit on the couch so they could discuss getting a divorce. Sarah said she wanted to remain where she was. Harbin entered the kitchen

---

[4] The baby cam footage was admitted at trial.

- 4 -

and started spitting in her face. R. 303. Sarah attempted to exit back out through the garage, but he caught up with her as she descended the stairs and put her in a choke hold. R. 303-04. Harbin had a tight squeeze on her neck with his forearm, and she fell backwards. R. 304. Her legs were "going every which way, like the floor had grease on them" and spit was coming out of her mouth. R. 304. Sarah "couldn't open [her] mouth," and "at times, [she] was biting the side of [her] tongue so hard." R. 304. Sarah almost lost consciousness before Harbin, at the "last second" released her and demanded her phone. R. 305. As Sarah gave Harbin her phone, he said, "You've got to stop crying, and you've got to shut the fuck up . . . because if the cops get called and they see your face, I'm going to jail." R. 305.

Harbin said, "come on, let's get you cleaned up" and put his hand out for her, but Sarah grabbed her keys and locked herself in her vehicle. R. 306. Sarah sustained a busted lip, a black eye, scrapes and bruising to her legs and feet, and an injury to her tongue. R. 307-08; CW's Ex. 5. She also lost her voice; her throat and neck hurt for days. R. 308. After the attack, Sarah texted Harbin a photograph of her eye and wrote, "Look at this shit. Not to mention the rest of my body and how my voice sounds. Alex get help. Please. We absolutely need to stay away from each other." Harbin responded, "Are you remorseful?" Sarah wrote, "Every single time I hurt your feelings, yes, I am," and Harbin responded, "Read all those messages and show me where [you are remorseful]." Sarah did not call the police because she was embarrassed and thought it would make things worse. At trial, on redirect examination, Sarah denied agreeing to engage in a physical altercation "at any time," attacking Harbin, and starting any of the arguments.

Daniqua Edwards worked with Sarah and saw her on the day after the October 2022 incident. Edwards testified that Sarah was "really distraught" that morning and that she was crying and shaking. Edwards observed an injury to Sarah's skull that looked "crumpled" and

- 5 -

swollen, and Sarah had a bite mark on her arm. She also had a large "greenish-purple" bruise on her arm and "massive knots" in her hair. Edwards again saw Sarah immediately after the July 2023 incident. She testified that on that day, Sarah "popped up at [her] house" shaking and crying. Edwards noticed that Sarah's eye was bruised and testified that Sarah "had a busted lip" and "little scratches" around her wrists.

Jennifer Santiago saw Sarah at work on the morning after the October 2022 incident. Santiago described Sarah's demeanor that day as "defeated, sad, broken." Santiago observed the large "knot" on Sarah's forehead and "new bleeding from [her] hair getting ripped out." Santiago also saw Sarah after the April 2023 incident and noted purple and pink bruising around her eye.

McDonald testified that she received a text message from Sarah attaching the baby cam video from the April 2023 incident. When she saw Sarah shortly thereafter, McDonald observed purple bruises to Sarah's eyes, face, and neck, and blood in her ear.

After the Commonwealth rested, Harbin moved to strike the evidence as insufficient to support the two child neglect charges and the three abduction charges. With respect to the child neglect offenses, Harbin argued that the evidence failed to prove a willful act in the care of the child that was so gross, wanton, and culpable as to show a reckless disregard for human life where the child was "not injured in any way, shape, or form." As for the abduction offenses, Harbin argued that in each instance, the asportation was merely incidental to the assaults that were occurring. Finding that the Commonwealth made a prima facie case for the offenses, the trial court denied the motion to strike.

Harbin testified that on October 11, 2022, he arrived at the house to see the baby, as he and Sarah were already estranged. He explained that he perched his phone on the top of the closet door to record any incident that might occur and then he and the baby fell asleep on the

- 6 -

bed. Harbin recounted that Sarah then ran into the room and punched him in the face, stating "what a piece of shit [he] was." When Sarah left and slammed the door, Harbin stated that "she knew that something happened." At that point, Sarah "opened the door quickly" and "saw [his] phone on the floor. That's when she pieced it together [that he was recording]." She then took the phone and deleted more than 4,000 photos from his iCloud and in his deleted folder.

Harbin testified that when she returned, Sarah attacked him. She hit, scratched, bit, kicked, and clawed at him until he finally grabbed her by her hair and held her down "just to get [her] to stop." When asked if he slammed her head on the floor, Harbin responded, "Pulling her away from me, maybe it's possible she hit the floor, but it's not my intention. My intention was to get her off of me." Harbin testified that he sustained an injury to his eye and scratches on his back from that incident.

Harbin explained that the April 2023 incident occurred after he began to suspect that Sarah was involved in an altercation he had had with his friend Anthony. When he confronted her, Sarah seemed to already know about the fight, so he asked to see her phone. Sarah ran into D.H.'s room because she wanted to "put the baby in the middle" of everything, and the two argued "for probably two minutes, an excessive amount." Harbin denied that the incident became physical while Sarah held the baby and insisted that "things calmed down." Harbin explained that he went back to the bedroom to find Sarah's phone and said that when it fell out of a pillowcase, he and Sarah "dove on top of it and started playing tug-of-war." Sarah kicked, hit, bit, scratched, and clawed at Harbin until D.H. started crying. He said that when Sarah went to get the baby, he left and went to the garage.

Harbin testified that in July 2023, he asked Sarah to "swing by the house" to "try and make up," and Sarah agreed. He said their intention was to have sex, so Sarah wanted to shower. As she finished her shower, Edwards knocked on the front door because she had seen Sarah's

location and was worried about her. That made Harbin wonder about who else might be calling Sarah, so after Edwards left, he asked to see her phone. When Sarah refused, they started fighting over the phone. Harbin testified that he wanted to know "who would be calling [Sarah] that she didn't want [him] to know about." He explained that he "told her to give it to [him], and that's what started the riot." They proceeded to fight over the phone. When he finally let go of the phone, Sarah "flew back and caught her face on the wall." She was injured because she was wearing sunglasses. Harbin said that when he knelt to help her up, she kicked him in the chest as hard as she could and then ran out through the front door.

After his testimony, Harbin renewed his motion to strike, again arguing that the evidence failed to support a conviction for either of the two child neglect offenses or the three abduction charges. As to the malicious wounding offenses, Harbin added that the evidence failed to prove he had the intent to maim, disfigure, disable, or kill Sarah and that, if he did, there was no malice. The trial court denied Harbin's renewed motion to strike and then heard closing arguments before finding Harbin guilty of all 11 offenses for which he was before the court.

ANALYSIS

I. Standard of Review

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). We do not ask ourselves "whether [we] believe[] that the evidence at the trial established guilt beyond a reasonable doubt." *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). Instead, "the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Caldwell v. Commonwealth*, 298 Va. 517, 526 (2020) (emphasis added)

(quoting *Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Raspberry*, 71 Va. App. at 29 (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "The trier of fact is not required to accept a party's evidence in its entirety, but is free to believe or disbelieve, in whole or in part, the testimony of any witness." *English v. Commonwealth*, 43 Va. App. 370, 371 (2004) (citations omitted). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)). "'[T]here can be no relief' in this Court if a witness testifies to facts 'which, if true, are sufficient' to support the conviction '[i]f the trier of the facts' bases its decision 'upon that testimony.'"[5] *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (alterations in original) (quoting *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010)).

---

[5] The principle from *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019), is especially important here because the trial court expressly credited Sarah's account after considering the parties' "credibility," "demeanor," "tone," and "body language," as well as the testimony of three independent witnesses.

## II. Abduction

"Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction.'" Code § 18.2-47. "[T]he *actus reus* of the crime is a taking, transporting, or detention of another, while the *mens rea* of the crime is a specific intent to deprive another of her liberty." *Brown v. Commonwealth*, 74 Va. App. 721, 730-31 (2022). To obtain a conviction for abduction under Code § 18.2-47, the evidence need only show, without more, the "physical detention of a person, with the intent to deprive [her] of [her] personal liberty, by force, intimidation, or deception." *Walker v. Commonwealth*, 47 Va. App. 114, 120 (2005) (quoting *Scott v. Commonwealth*, 228 Va. 519, 526 (1984)). Force requires "evidence of 'some array or show of force in form sufficient to overcome resistance'" and "must be used to overcome the victim's will." *Sabol v. Commonwealth*, 37 Va. App. 9, 16 (2001) (quoting *Jones v. Commonwealth*, 219 Va. 983, 986 (1979)).

At the same time, we have held that "the General Assembly 'did not intend to make the kind of restraint[,] which is an intrinsic element of crimes such as rape, robbery, and assault a criminal act, punishable as a separate offense.'" *Hoyt v. Commonwealth*, 44 Va. App. 489, 492 (2004) (quoting *Brown v. Commonwealth*, 230 Va. 310, 314 (1985)). Thus, the issue to be resolved "when abduction is charged alongside an offense for which detention is an intrinsic element is whether any detention exceeded the minimum necessary to complete the required elements of the other offense." *Lawlor v. Commonwealth*, 285 Va. 187, 225 (2013). In other words, for abduction to be punishable as a separate offense, the detention must be "separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime." *Vay v. Commonwealth*, 67 Va. App. 236, 250 (2017) (quoting *Brown*, 230 Va. at 314). We focus "not on whether the restraint was merely useful to perpetrating a detention-plus crime—but whether the restraint was 'intrinsic' to or

- 10 -

'inherent' in the detention-plus crime." *Pryor v. Commonwealth*, 48 Va. App. 1, 6 (2006) (citations omitted).

To that end, we often consider

> (1) the duration of the detention or asportation, (2) whether the detention or asportation occurred during the commission of a separate offense, (3) whether the detention or asportation which occurred is inherent in the separate offense, and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Wiggins v. Commonwealth*, 47 Va. App. 173, 183 (2005) (quotation marks omitted) (quoting *Hoyt*, 44 Va. App. at 494).

However, our consideration of these factors is merely "permissive," and we need not analyze each one separately. *Swezey v. Commonwealth*, 77 Va. App. 809, 817 (2023). The pertinent question in this appeal is "whether sufficient evidence exists to support the factfinder's determination that a defendant used a greater restraint than that necessary to commit the simultaneously charged offense." *Epps v. Commonwealth*, 66 Va. App. 393, 403 (2016). "[W]hether the detention established by the evidence is 'the kind of restraint which is *an intrinsic element* of crimes such as rape, robbery, and assault,' is a question of law to be determined by the court." *Lawlor*, 285 Va. at 229 (quoting *Brown*, 230 Va. at 314).

Harbin argues that there was no evidence he took any steps independent of the assaults on Sarah that supported the extra abduction charges. He argues that in the October 2022 incident, he grabbed Sarah's hair, pulled her down as part of the assault, and then pulled her a short distance into the hallway, and thus that there was no evidence he engaged in "any extraneous form of restraint or acted to avoid detection," nor did he place her in an area where she would "inherently suffer a significant risk of harm." Harbin reasons that any detention occurred during the assault, was inherent to the assault, and did not create a significant danger to Sarah independent of that posed by the separate offense. He likewise maintains that during the July 2023 incident, the evidence failed

- 11 -

to prove he detained Sarah after the assault ended and, instead, "merely grabbed [her] and caused her to fall back, transporting her no distance and detaining her for no period of time separate from the assault." He concludes that any detention was merely incidental to the assault.

However, the record shows otherwise. The evidence showed, and the trial court found, that during the October 2022 incident Harbin entered the bedroom where Sarah and the baby were sleeping. He ripped the covers off Sarah, grabbed both sides of her hair at the roots, pulled her to the floor, spat on her, called her a "bitch" and a "whore," and then punched, slapped, and kicked her repeatedly about her face and body. Sarah testified that Harbin briefly stopped the attack as she stood up to get D.H. As Sarah stood holding the child, she decided to "make a run for it." Rather than allowing Sarah to leave the bedroom with D.H., Harbin again grabbed her by the hair and pulled her backward and downward, causing Sarah to drop the baby and fall to the floor. From this evidence, the trial court could reasonably conclude that this restraint was not merely the force inherent in the initial bedroom assault. It was a separate restraint used to stop Sarah's attempted escape with the child, and it exceeded the force necessary to complete the assault Harbin had already committed. Since that restraint prevented Sarah from leaving the bedroom with D.H. before Harbin dragged her into the hallway, the trial court could find two discrete detentions even though they occurred during the same incident.

The entire incident did not end there. Sarah testified that after pulling her to the floor, Harbin dragged her into the hallway and repeatedly slammed her head on the threshold of the bathroom door. As he did so, Harbin straddled Sarah's body and told her that he was "going to kill [her]" and "take [her] head off." Sarah heard D.H. crying in the bedroom but, because Harbin dragged her away and pinned her down, she could not get up, return to the bedroom, and comfort her daughter. That evidence proved an additional act of abduction. The hallway restraint was not merely the force inherent in striking Sarah; the additional force moved her from the bedroom,

- 12 -

separated her from D.H., placed her at the bathroom threshold where her head was repeatedly slammed, and kept her pinned down where she could not return to the crying baby. In other words, Harbin forcefully detained Sarah with the intent to deprive her of her personal liberty. Thus, even though the restraints occurred during the same overall episode, the evidence permitted the trial court to reasonably conclude that they were separate and apart from the force necessary to commit the assaults.

Harbin's contrary testimony does not alter our conclusion. The trial court heard and considered his testimony and rejected it. The trial court specifically found that although "the question of credibility is more of a close call, given these events [that] occurred on October 11, 2022," the photographs of Sarah's injuries from that night, the text message she sent to Harbin the next day, and the testimony of her witnesses concerning "their recollection of what they observed" sufficiently corroborated Sarah's version of events. In any case, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). Thus, we find no error in the trial court's conclusion that Harbin committed two acts of abduction on October 11, 2022.[6]

The evidence also sufficiently proved that Harbin committed abduction on July 27, 2023. During that incident, the evidence showed that Harbin asked Sarah to meet him at the home after she had already moved out, and Sarah testified that they had been "getting along for the most part."

---

[6] Harbin emphasizes that the events on October 11 occurred close in time. However, we review the evidence, not counsel's characterization of it during argument below. Sarah's testimony supported two distinct restraints: Harbin first grabbed her hair and pulled her backward as she tried to flee the bedroom with D.H., causing the child to fall onto the bed. He then dragged Sarah into the hallway, straddled her, and repeatedly slammed her head into the bathroom threshold while D.H. cried from the bedroom.

But when Sarah entered the house, Harbin had a stern look on his face and she "knew what was coming." When she refused to sit on the couch, Harbin entered the kitchen and spat in her face several times. Spitting in someone's face is a battery. *See Gilbert v. Commonwealth*, 45 Va. App. 67, 71-72 (2005). Sarah told Harbin to stop and *attempted to leave*, but Harbin followed her out the door and placed her in a chokehold, causing Sarah to fall backwards. She testified that his grip was so tight that spit came out of her mouth, and she bit her tongue causing an injury. As he pulled her backward, Sarah's feet "were going every which way, like the floor had grease on them" and she felt like she might lose consciousness. Sarah's testimony was again corroborated by photographs of her injuries and the text message she sent to Harbin after the incident telling him to "[l]ook at this shit," and to "get help, please."

This evidence permitted the trial court to distinguish between the completed battery and the later restraint. Harbin first assaulted Sarah by repeatedly spitting in her face. When Sarah then attempted to leave through the garage, Harbin followed her, placed her in a chokehold, and pulled her backward. The trial court could therefore view the chokehold not only as violence inflicted on Sarah, but also as the means by which Harbin stopped her attempted exit from the home and deprived her of her personal liberty. Although the spitting and chokehold occurred during the same overall incident, the evidence permitted the court to find that the chokehold used "greater restraint than that necessary to commit" the assault and battery. *See Epps*, 66 Va. App. at 403. Accordingly, we affirm the trial court's finding that Harbin abducted Sarah on July 27, 2023.

### III. Reckless Care of a Child

"Any parent . . . responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life is guilty of a Class 6 felony." Code § 18.2-371.1(B)(1). The requirements for this statute are fulfilled when the parent "subjects a child to a substantial risk of serious injury, as

well as to a risk of death, because exposure to either type of risk can endanger the child's life." *Jones v. Commonwealth*, 272 Va. 692, 698 (2006) (quoting *Commonwealth v. Duncan*, 267 Va. 377, 385 (2004)) (upholding a conviction where the mother left capsules of heroin within reach of her son). A willful act is one that "is intentional, or knowing, or voluntary." *Flowers v. Commonwealth*, 49 Va. App. 241, 248 (2007) (quoting *Ellis v. Commonwealth*, 29 Va. App. 548, 554 (1999)). "When considering the level of danger necessary to support a conviction under Code § 18.2-371.1(B)(1), we have held that 'the act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury.'" *Jones*, 272 Va. at 701 (quoting *Barrett v. Commonwealth*, 268 Va. 170, 183 (2004)). Furthermore, "[c]riminal negligence is 'judged under an objective standard and, therefore, may be found to exist where the offender either knew or should have known the probable results of his acts.'" *Id.* (quoting *Kelly v. Commonwealth*, 42 Va. App. 347, 356 (2004)).

The record supports the trial court's finding that Harbin exhibited a reckless disregard for his daughter's life in October 2022 when he grabbed Sarah by the hair and pulled her to the ground causing Sarah to drop D.H. Harbin was aware that Sarah was holding the baby but continued using force anyway. The fact that D.H. landed on the bed does not preclude a finding that Harbin placed her at substantial risk of serious injury; it means only that the risk did not result in actual injury. *Jones*, 272 Va. at 698.

Similarly, during the April 2023 incident, Sarah held D.H. in her arms while Harbin repeatedly kicked and stomped her "over and over again" and then hit and slapped her. Sarah testified that D.H. was "[n]ot even a year" old, remained in Sarah's arms during the attack, and was "screaming" because "[s]he was scared." Sarah further testified that she wrapped D.H. in her arms to keep the blows from landing on the baby. It was only because Sarah covered the child with her arms that Harbin's kicks did not strike D.H. Had any of his kicks or punches landed on her,

- 15 -

serious injury to the child could have resulted. "Code § 18.2-371.1(B)(1) does not require that a child actually suffer serious injury as a result of a defendant's acts or omissions." *Duncan*, 267 Va. at 385. Nor does subsection (B)(1) "limit the prohibited conduct to acts and omissions that subject a child to an actual risk of death." *Id.* Rather, Code § 18.2-371.1(B)(1) merely "proscribes conduct that is so 'gross, wanton and culpable' as to demonstrate a 'reckless disregard' for the child's life." *Id.*

On this record, the trial court could reasonably conclude there was more than a speculative possibility of harm. In October, Harbin pulled Sarah down while she held the infant, causing D.H. to fall from Sarah's arms onto the bed. In April, he knocked Sarah to the floor while she held D.H. and then kicked and stomped Sarah as Sarah used her own body to shield the child. We therefore affirm both convictions for reckless care of a child.

## IV. Malicious Wounding

"If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony." Code § 18.2-51. When a statute "makes an offense consist of an act combined with a particular *intent*, such *intent* is as necessary to be proved as the act itself, and it is necessary for the intent to be established as a matter of fact before a conviction can be had." *Vincent v. Commonwealth*, 276 Va. 648, 652 (2008) (quoting *Dixon v. Commonwealth*, 197 Va. 380, 382 (1955)). Harbin asserts that the evidence failed to prove he had the requisite intent under the statute.[7] However, the trial court expressly found that "it [could] infer from the testimony of Ms. Harbin that malice was present" because Harbin's conduct was "deliberate," "cruel," and "harbored by feelings of hatred."

---

[7] On appeal, Harbin does not argue that the Commonwealth failed to prove the element of malice.

"Intent is the purpose formed in a person's mind at the time an act is committed" that "may, and often must, be inferred from the facts and circumstances of the case, including the actions and statements of the accused." *Johnson v. Commonwealth*, 53 Va. App. 79, 100 (2008) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 519 (1998)). "The question of whether a defendant possessed the requisite intent normally rests with the finder of fact." *Id.* at 100-01. Since intent is often impossible to prove by direct evidence, it "may, and most often must, be proven by circumstantial evidence." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)). "[C]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Id.* (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). Moreover, "[t]he finder of fact may infer that a 'person intends the natural and probable consequences of his or her acts.'" *Johnson*, 53 Va. App. at 100 (quoting *Velasquez v. Commonwealth*, 276 Va. 326, 330 (2008)).

Harbin's two convictions for malicious wounding arose from his actions on October 11, 2022, and April 6, 2023. Sarah testified that during the October assault, Harbin "ripped" her out of bed by her hair, pulled her to the floor, spat on her, called her a bitch and a whore, and then punched, slapped, and kicked her "everywhere" on her face and body. He then dragged her by her hair from the bedroom and into the hallway, stood over her body, and slammed her face against the floor several times. He told her she was "going to fucking die." The trial court was not required to treat those threats as empty words; it could consider them alongside the severity of the beating and Sarah's resulting injuries. Sarah had visible injuries after the attack, including "knots" on her forehead and scalp, bruises all over her body, and bald spots on her scalp from where Harbin pulled out her hair. Edwards observed those injuries and said Sarah was "distraught."

During the April 6 incident, Sarah was again sleeping in her bed when Harbin became angry and began to punch her with his fists. He punched Sarah so hard in the ribs that he knocked the air out of her, and he screamed "vulgar, nasty things." Harbin then followed Sarah into the baby's room, pushed the crib out of the way, grabbed Sarah by the neck, and headbutted her. When she fell to the ground with the baby, Harbin kicked her with the front of his boot and then stomped on her "over and over again," all while again hurling insults at Sarah. After the attack, she was missing chunks of hair and sustained a knot on her forehead, neck injuries, bruising, a bloodied lip, blood in her ear, and a black eye.

Harbin's reliance on the absence of a weapon and Sarah's decision not to seek medical treatment does not undermine the evidence of his intent. The statute does not require the use of a weapon, and Sarah explained that she did not seek treatment after the October incident because she was ashamed and "didn't want to admit" the abuse was occurring. After the April incident, she did not seek treatment because she was "just happy it was over."

We hold that a rational fact finder could conclude from the unprovoked nature of these attacks, the severity of the beatings, the injuries to Sarah's body, and Harbin's demeaning, vulgar, and threatening comments and overall lack of remorse that on both occasions, he intended to maim, disfigure, disable, or kill her. Intent is a finding of fact to be determined in light of the circumstances in each case. *Johnson*, 53 Va. App. at 103-04. Viewed in totality, the facts proved that Harbin had the requisite intent to maim, disfigure, disable, or kill Sarah. We, therefore, affirm his malicious wounding convictions.

CONCLUSION

For these reasons, this Court affirms the trial court's judgment.

*Affirmed.*